Slip-Op. No. 22-74

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. and C&U AMERICAS, LLC, <br><br> *Plaintiff,* <br><br> and <br><br> PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD, and HEBEI XINTAI BEARING FORGING CO., LTD, <br><br> *Consolidated Plaintiffs* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant.* | Before: Stephen Alexander Vaden, Judge <br><br> Consol. Court No. 1:22-cv-00038 |

## <u>OPINION</u>

[Denying Plaintiffs' Motion for injunctive relief.]

Dated: June 17, 2022

*David J. Craven*, Craven Trade Law LLC, of Chicago, Illinois, for the Plaintiff.

*Kelly A. Krystyniak*, Trial Attorney, U.S. Department of Justice, of Washington, D.C., for the Defendant.  With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, U.S. Department of Justice, Commercial Litigation Branch, and

*Jesus N. Saenz*, U.S. Department of Commerce, Office of the Chief Counsel for Trade Civil Division Enforcement and Compliance.

**Vaden, Judge:**  On February 24, 2022, Plaintiffs Shanghai Tainai Bearing Co., Ltd. and C&U Americas LLC (collectively, Plaintiffs) filed a twelve-count complaint challenging certain aspects of the Final Results published by the Department of Commerce (Commerce) in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China*, 87 Fed. Reg. 1,120 (Jan. 10, 2022).  On the consent of all parties, Judge Restani issued an order enjoining liquidation on February 28, 2022.  ECF No. 9.  Pursuant to CIT Rules 7 and 65(a), Plaintiffs now seek a further injunction.  Plaintiffs move to enjoin Commerce and U.S. Customs and Border Protection (Customs) from collecting cash deposits at the rate set forth in the contested Final Results.  In the alternative, Plaintiffs submit a petition for a writ of mandamus to the Court, seeking the same outcome.  They propose an indefinite duration for this remedy, which they request cease only on the completion of this proceeding, including any remand or appeal therefrom.  The Government opposes this remedy, Plaintiffs' preferred duration for it, and the validity of both the injunction and alternative writ sought.  For the reasons that follow, the Motion to enjoin Commerce and Customs from requiring Plaintiffs to pay cash deposits is **DENIED**.  Plaintiffs' request for a writ of mandamus is also **DENIED**.

## BACKGROUND

### I. Procedural History

On August 6, 2020, Commerce began an administrative review of the antidumping duty order covering tapered roller bearings (TRBs) from China as applied to the period from June 1, 2019, to May 31, 2020. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 54,983, 54,990 (Dep't of Commerce Sept. 3, 2020)*; see also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731 (Dep't of Commerce Aug. 6, 2020) (setting out Initiation Notice). Commerce determined that it could examine one company to achieve the investigation's goals, Plaintiff Shanghai Tainai Bearing Co., Ltd. (Shanghai Tainai). It selected the company because of the volume of its entries of the covered goods — it is the largest exporter of TRBs from China. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 86 Fed. Reg. 36,099 (Dep't of Commerce July 8, 2021) (Prelim. Results) (P.R. 189) and accompanying Preliminary Decision Memorandum (PDM) at 2 (P.R. 181).

In early July 2021, Commerce provided preliminary results. Those results indicated Commerce observed several "deficiencies and inconsistencies" among documents from Shanghai Tainai's reporting of its data regarding factors of production. Def.'s Resp. at 4; *see* PDM at 15. Consequently, Commerce used facts available to account for Plaintiff's inaccurately reported factors of production data; Commerce did not apply adverse inferences at this early stage. PDM at 15–16.

Commerce also noted that mandatory information remained missing from Shanghai Tainai's completed questionnaire responses.  Among the most notable missing facts were "direct input bills of materials . . . for production of subject merchandise," which Plaintiff needed to collect from its suppliers.  *Id*.  This information is a crucial baseline data set to validate Shanghai Tainai's factors of production.  *Id*.  Nonetheless, Commerce proceeded to calculate a preliminary, estimated, weighted-average dumping margin — 36.75% — by relying on the factors of production reported by Plaintiff, sans substantiating documentation.  Prelim. Results, 86 Fed. Reg. at 36,100.

Seeking to resolve these gaps in reported information, Commerce provided Shanghai Tainai with a Supplemental Questionnaire (P.R. 191) before issuing its Final Results.  Plaintiff failed to respond.  Commerce also sent similar questionnaires to Shanghai Tainai's unaffiliated suppliers, who were similarly non-responsive.  IDM at 7; *see also* Commerce's Request for Information Letter (Aug. 17, 2021) (P.R. 192).

On January 10, 2022, Commerce provided Final Results for its investigation. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022) (Final Results) (P.R. 222); *see also* accompanying Issues and Decision Memorandum (IDM) (P.R. 214).  In its report, Commerce found that Shanghai Tainai's submitted allocation methodology could no longer be used to determine factors of production based on goods purchased from unaffiliated suppliers because the third parties had not cooperated with the Department.  To substantiate Shanghai Tainai's claims,

Commerce needed information regarding the factors of production from these unaffiliated suppliers.  IDM at 10–14.

Because of this, Commerce applied partial adverse facts available for the missing factors of production data.  This required supplanting Plaintiff's proffered data with similar information provided by its affiliated suppliers.  *Id.*  Commerce's justification lay in its conclusion that Shanghai Tainai could "induce compliance with requests" for data in the future.  "Commerce chose Tainai as a mandatory respondent in this review because it accounted for the largest volume of entries of subject merchandise"; and because of "the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that [Shanghai] Tainai is an important customer to its Chinese TRB suppliers."  IDM at 13.  This status put Plaintiff "in a position to exercise its leverage over its TRB suppliers to induce them to cooperate."  *Id.*

The magnitude of the missing data — it corresponded to the vast majority of subject merchandise — produced a much different rate than the one calculated according to Shanghai Tainai's estimated costs, which had appeared in the preliminary determination.  *See Tainai Calculation Memorandum* at Attachment III, tab Exhibit SSD-1.1 (noting that nearly all of the reported information would have come from unaffiliated suppliers) (P.R. 216–17, C.R. 209–10).  Commerce observed this derives, in part, from Shanghai Tainai's position in the production of TRBs. Plaintiff does not develop or add value to the "finishing and grinding stages in the TRBs supply chain"; it buys components after those stages.  IDM at 11.  For that reason, the "extrapolation of data from certain affiliated suppliers to account for its

unaffiliated suppliers' [factors of production] usage rates is nothing more than speculation," fundamentally undermining Shanghai Tainai's allocation methodology. *Id.* Given these circumstances, Commerce applied a partial adverse inference to the facts available to produce a weighted-average dumping margin of 538.79 percent. Final Results 87 Fed. Reg. at 1,121. This result prompted Plaintiff's lawsuit, which challenges the allegedly incorrect calculations employed to arrive at Commerce's Final Results. ECF Nos. 1, 7.

## II. Legal Background

The Tariff Act of 1930 authorizes Commerce to investigate alleged dumping activity. If documented, this activity is penalized by antidumping duties on the unfairly priced goods. *Sioux Honey Ass'n v. Hartford Fire Ins.*, 672 F.3d 1041, 1046 (Fed. Cir. 2012). The statute defines dumping as the sale of products in the United States by a foreign company at prices below their fair value. 19 U.S.C. § 1677b(a).

To impose antidumping duties, Commerce assesses whether goods are being sold at less than their fair value. 19 U.S.C. § 1673. If dumping has occurred, the International Trade Commission (ITC) then evaluates whether American domestic industries producing like goods are materially injured or threatened with material injury. The ITC also determines whether the domestic growth of industries producing the same goods is threatened by the sale of the dumped product. *Id.* If dumping is documented to have "materially injured" or "threatened with material injury" a domestic industry, or "materially retarded" the establishment of a domestic industry, Commerce proceeds to impose antidumping duties. 19 U.S.C. § 1673(2)(A)–(B).

For individual companies under investigation, Commerce's action vis-à-vis duties begins when the Department preliminarily concludes that duties are appropriate. Its staff then publishes a detailed preliminary determination establishing the duty rates assessed for specific cases, providing baseline explanations for its findings. 19 U.S.C. § 1673b(d)(1). Afterward, Commerce orders exporters to post security for subject merchandise. Liquidation is suspended on "all entries of merchandise subject to the [preliminary] determination which are entered, or withdrawn from warehouse, for consumption on or after" publication of the preliminary determination or sixty days from publication of notice of initiation of the investigation. 19 U.S.C. § 1673b(d)(2)(A)–(B). The duty rates provided in the preliminary determination and a halt on liquidation are imposed for a minimum of four and a maximum of six months. 19 U.S.C. § 1673b(d)(3). Commerce then provides a final determination of duty rates. If its initial determination is sustained, the suspension of liquidation applied to subject merchandise remains in place through the process of administrative review. *See* 19 U.S.C. § 1673d(c)(4).

Affected businesses may face hardships because of the "'retrospective' assessment system" adopted by the United States. 19 C.F.R. § 351.213(a). This system requires that "final liability for antidumping . . . duties is determined after merchandise is imported." *Id.* Final duty liability is decided following an administrative review. *Id.* An antidumping order may be reviewed following a request submitted after the first anniversary of its publication. 19 C.F.R. § 351.213(a)(b)(1). The first administrative review examines the period from the

commencement of suspension of liquidation to the month immediately prior to the anniversary month. In the case of subsequent reviews, the evaluation takes place one year immediately prior to the anniversary month. 19 C.F.R. § 351.213(e)(1). Once these administrative reviews are completed, Commerce publishes the final applicable duty rates. Customs then liquidates relevant entries within six months. 19 U.S.C. § 1673(a)(1).

Distinct from preliminary injunctions to suspend liquidation, enjoining the collection of cash deposits is a separate and unusual remedy. The former seeks to preserve a party's litigation options and ensure a full and fair review of duty determinations before liquidation. The statute expressly contemplates these steps. *See* 19 U.S.C. § 1516a(c)(2) (providing that the CIT "may enjoin the liquidation of some or all entries of merchandise covered by a determination of the Secretary, the administering authority, or the Commission"). However, the latter remedy is rarer and harder to obtain because the statutory and regulatory antidumping duty regime envisions a stricter application of the procedure. *See* 19 U.S.C. §§ 1671f, 1673f, 1677g; 19 C.F.R. § 351.205(d) (providing for importers to pay cash deposits higher than what is finally determined they owe, relying on subsequent mechanisms to return excess collections). Congress chose this prepayment process to protect the public fisc and to ensure the Government receives the tariffs due. *See* 19 U.S.C. § 1673b(d)(1)(B). The deposit requirement remains even in instances where the potential liability borne by a party remains uncertain. *Id*. (requiring collection of cash deposits on affirmative *preliminary* determination in antidumping duty investigation); 19 U.S.C. §

1673d(c)(1)(B)(ii) (making the continuation of cash deposits obligatory on the issuance of an affirmative final determination for antidumping duty investigations). The distinction between liquidation and the statutory deposit requirement — reflected in the likelihood of successfully enjoining each — is grounded in the text of relevant statutes as well as longstanding CIT jurisprudence.

### III.  Prior Injunctive Relief

The Court takes special notice in this case of the injunctive relief already provided to Plaintiffs. Just over two weeks after Shanghai Tainai commenced the present action, on February 8, 2022, and just four days after it filed its Complaint, on February 24, 2022, Judge Restani enjoined liquidation. The basis for Plaintiffs' Motion and proffered writ is their insistence this initial equitable remedy remains insufficient. To avoid permanent harm to its business interests, Shanghai Tainai now seeks a preliminary injunction preventing Customs from collecting cash deposits. Like the injunction obtained against liquidation, Shanghai Tainai seeks this additional equitable relief pending the completion of proceedings in the Court of International Trade arising from its challenge to the Final Results.

### JURISDICTION AND STANDARD OF REVIEW

The Court maintains adjudicatory authority over the underlying action. 28 U.S.C. § 1581(c). "The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930." *Id.* At this early stage in the case, Plaintiffs seek a second preliminary injunction, an extraordinary form of equitable relief. It shall issue only where the movant

establishes that:  (1) it will suffer irreparable harm absent the requested relief; (2) it is likely to succeed on the merits of its underlying claim; (3) the balance of the hardships favors the movant; and (4) the public interest would be served by the injunction.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (citations omitted).

In the Federal Circuit, the fulfillment of the four factors bears a complex relationship to the outcome determined by the Court.  "'[N]o one factor, taken individually, is necessarily dispositive.'"  *Ugine & Alz Belg. v. United States*, 452 F.3d 1289, 1292–93 (Fed. Cir. 2006) (quoting *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993)).  However, "irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits and irreparable harm."  *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (refusing to grant plaintiff preliminary relief "unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (emphasis in original) (citation omitted).  Because "the weakness of the showing regarding one factor may be overborne by the strength of the others," *FMC Corp.*, 3 F.3d at 427, "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits [plaintiffs] need show in order to get the injunction." *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1378–79 (Fed. Cir. 2009) (quoting *Kowalski v. Chi. Trib. Co.*, 854 F.2d 168, 170 (7th Cir. 1988)).

Nonetheless, "an [adequate] showing on one preliminary injunction factor does not warrant injunctive relief in light of a weak showing on other factors." *Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 100 (Fed. Cir. 2014) (citing *Winter*, 555 U.S. at 22). *Cf. Winter*, 555 U.S. at 26 (denying injunctive relief because of public interest in national security); *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (CIT 2018), *aff'd*, 923 F.3d 1340 (Fed. Cir. 2019) (lacking evidence of immediate irreparable harm compels denial of preliminary injunction); *Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1316 (failing to establish irreparable harm sufficient to deny injunction).

## DISCUSSION

### I. Preliminary Injunction

#### a. Irreparable Harm

For Plaintiffs to prevail, they must establish irreparable injury is likely to accrue to them immediately if the requested equitable relief is not issued. *Winter*, 555 U.S. at 22. Harm is found to be irreparable if "no damages payment, however great," could redress it. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Imminence of injury is also required, *Zenith Radio*, 710 F.2d at 809, yet this immediacy does not equate to a demonstration that the harm complained of has already occurred. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (holding movant must show a "cognizable danger of recurrent violation, something more than a mere possibility which serves to keep the case alive"). A moving party must put forward more than mere "speculative" evidence to demonstrate an

"immediate and viable" likelihood of injury.  *Otter*, 37 F. Supp. 3d at 1315 (quoting *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1326 (CIT 2014)); *Sumecht*, 331 F. Supp. 3d at 1412 (citing *Zenith Radio*, 710 F.2d at 809).  To analyze whether Plaintiffs have met this "extremely heavy burden," *Shandong Huarong Gen. Grp. v. United States*, 122 F. Supp.2d 143, 146 (CIT 2000), the Court will assess "the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief."  *Sunpreme Inc. v. United States*, 181 F. Supp. 3d 1322, 1331 (CIT 2016).

Bare financial losses neither constitute nor substantiate irreparable harm, even when they signal economic damage to an entity.  This derives in part from the presumed effectiveness of corrective relief for monetary injury, provided by a Court order at a later date.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (noting that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm"); *Corus Group PLC v. Bush,* 217 F. Supp. 2d 1347, 1355 (CIT 2002) (holding "economic injury" insufficient to establish irreparable harm).  The *Corus* Court found, for example, that *plans* to close a plant to avoid "operat[ing] at a loss," did not establish irreparable harm because there was no "danger of imminent closure" of the plant.  217 F. Supp. 2d at 1355.  On the other end of the spectrum, bankruptcy stemming from a substantial decline of business is grave enough to demonstrate the inadequacy of later corrective relief.  *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("Certainly [bankruptcy] sufficiently meets the

standards for granting interim relief, for otherwise a favorable final judgment might well be useless."); *McAfee v. United States*, 3 CIT 20, 24 (1982) ("It is difficult for this court to envision any irreparable damage to a plaintiff and his business more deserving of equitable relief than the very loss of the business itself."). Generally, a movant must show "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities" severe enough to represent an imminent threat to the continuation of the business. *Celsis In Vitro*, 664 F.3d at 930 (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008)).

Plaintiffs' Motion fails to meet this high standard. Before addressing the specifics of their arguments, the Court observes the tenuous link established between harm done to Shanghai Tainai as opposed to harm done to C&U Americas. Evidence of one or the other does not necessarily equate to a shared or reciprocal impact on both. In their Complaint, the relationship between Shanghai Tainai and C&U Americas is stated in only the loosest terms:

> Plaintiff C&U Americas, Llc ("C&U") is a Corporation organized under the laws of the United States. Plaintiff Tainai produced Tapered Roller Bearings in the People's Republic and exported the same to the United States. Plaintiff C&U imported, distributed and sold Tapered Roller Bearings in the United States. Both parties were active participants in the Administrative Review and Tainai was designated as a mandatory respondent.

Compl. at ¶ 3, ECF No. 7. These statements remain largely unelaborated, despite ample opportunity for the parties provide the Court with necessary detail.[1]

---

[1] The Court cannot hypothesize the nature of this relationship. It offered Plaintiffs' counsel the opportunity to submit a reply brief when the Government questioned the specifics of the relationship. Plaintiffs' counsel declined despite bearing the burden of proof of entitlement to the requested relief. *See Winter*, 555 U.S. at 22.

The relationship remains a recurring mystery in the evidence put forward to support Plaintiffs' request for injunctive relief.  For example, Plaintiffs rely heavily on a four-page affidavit by Mr. Jason Stocker, president of C&U Americas.  ECF No. 17-1 at 20–23.  Mr. Stocker's declaration leaves the Court to guess about the two entities' business dealings because he fails even to mention Shanghai Tainai or how its specific plight will impact the business he leads.  Defendant notes that, "[w]hile Tainai did place a 'sales agreement' between it and [C&U Americas] on the record, (C.R. 31, 36)," Plaintiffs' "motion fails entirely to explain how [C&U Americas] will be affected by the rate assigned to Tainai, including the extent of that affect."  Def.'s Resp. at 9, ECF No. 19.  Mere implied association via the global marketplace does not answer this query.

Regarding harm to C&U Americas, Mr. Stocker's declaration provides some useful, if inadequate, information in support of the potential for irreparable harm. He notes that, in the sale of TRBs, "each bearing type and model must be tested by the producer and approved for use in production," rendering a significant regulatory burden on resellers like his company.  ECF No. 17-1 at 20.  He further raises the dearth of alternative suppliers, *id.* at 21, as well as the difficulties his corporation faces in financing the tariff deposits that have been levied.  *Id.* at 21–22.

Despite these circumstances, Mr. Stocker admits that market forces are leading consumers to take ameliorative steps.  *Id.* at 22.  To his mind, these "immediate changes away from [C&U Americas]" are unanticipated detriments to his bottom line.  *Id.*  Disadvantageous as they may be for Mr. Stocker, these market

changes fail to meet his high burden to justify injunctive relief.  Mr. Stocker provides no evidence of either a harm akin to an imminent plant closure or of specific customers threatened by the involuntary cessation of their business practices. Indeed, some C&U Americas customers have agreed to pay "some or all" of the increased duties, mitigating the harm by which he is aggrieved.  *Id.* at 22.  By his own observations, therefore, Mr. Stocker's allegations are substantially less potent than those adduced by other failed injunction applicants.

Plaintiffs' Motion also lacks evidence of the alleged harm's immediacy.  An authoritative dictionary suggests "immediate" equates to "occurring, acting, or accomplished without loss or interval of time," providing the synonym "instant," with the secondary definition of "near to or related to the present."  *Immediate*, Merriam-Webster.com,      https://www.merriam-webster.com/dictionary/immediate (last visited April 12, 2022)).   Precedent echoes the dictionary.   In *Shandong Huarong*, an affidavit from an importer's "major [American] customer" that it would be compelled to cancel all orders in the event the court sustained cash deposits was adjudged "weak evidence, unlikely to justify a preliminary injunction," largely because it fell short of "indicating exactly how and when these lost sales would force [plaintiff] out of business."  122 F. Supp. 2d at 1369–70.  Mr. Stocker's affidavit is weaker than in *Shandong*.  It merely states that C&U Americas "continue[s] to negotiate with" some buyers to persuade them "to accept a pass through of the duties."  ECF No. 17-1 at 22; *cf. Sunpreme Inc.*, 181 F. Supp. 3d at 1331 ("Without a preliminary injunction . . . [the] loss of goodwill, damage to [Plaintiff's] reputation,

and loss of business opportunities from the continued collection of cash deposits until the case is resolved on the merits, . . . will only grow more severe."); *U.S. Auto Parts Network, Inc. v. United State*s, 319 F. Supp. 3d 1303, 1308 (CIT 2018) (finding irreparable harm because financial records demonstrated plaintiff would remain in business for "at best, a couple weeks" if a bond requirement were sustained). Plaintiffs have therefore failed to demonstrate either an irreparable or sufficiently immediate harm to gain injunctive relief.

### b.  Likelihood of Success

In addition to demonstrating that irreparable harm would occur without an injunction, a movant must also establish a likelihood of success on the merits in its case in order to obtain the extraordinary remedy of enjoining the collection of cash deposits.  *Sunpreme Inc.*, 181 F. Supp. 3d at 1331.  When the Court assesses Commerce's tariff determinations, the Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  To begin to meet this standard, Plaintiffs must contest Commerce's use of partial adverse inferences drawn from facts available.  Conclusory statements do not suffice to challenge complex evaluations undertaken by the Government regarding when and how to apply partial adverse inferences drawn from facts available.

Plaintiffs' arguments do not meet their burden.  Instead, they deem the high rate assessed *alone* to be abundant evidence that there must be error in Commerce's determinations.  They cite several cases in which high rates were applied and

16

ultimately found invalid.  Pls.' Mot. at 10–14, ECF No. 17-1.  Yet Plaintiffs skip over the interceding analysis that led to the conclusion that a rate defies "commercial and economic reality."  *Baoding Mantong Fine Chemistry v United States*, 113 F. Supp. 3d 1332, 1334 (CIT 2015); Pls.' Mot. at 10–11, ECF No. 17-1.  The Motion seems to imply counsel's recognition that more is needed, noting "[i]n its [sic] complaint, plaintiffs challenge a number of significant issues."  Pls.' Mot. at 11, ECF No. 17-1. The sentences that follow merely list these issues; Plaintiffs do not dwell on how they may add up to an incorrect determination by Commerce.

As the Government rightly contends, despite ample opportunity, Plaintiffs "do not challenge the *substance* of Commerce's Final Results."  Def.'s Resp. at 14, ECF No. 19.  Instead, Plaintiffs rest their claim of likely success on the merits on a presumption that Commerce's determined rate must be "punitive." Pls.' Mot. at 11–14, ECF No. 17-1.  Although Plaintiffs could have expanded their analysis to include relevant evidence demonstrating likelihood of success on the merits, they chose not to do so.

Plaintiffs also undermine the confidence the Court might have in their argument by asserting contradictory "issues" they suggest support the likelihood of their success on the merits.  They state "the Department's decision to take partial adverse inferences was not supported by the record as no information was missing from the record."  *Id.* at 11, ECF No. 17-1.  The very next issue raised seems to imply the opposite:  "[A]ny purportedly missing information was that of unrelated third-parties and the Department cannot impose adverse facts where any purported

missing information is that of unrelated parties not under the control of the respondent." *Id.*, ECF No. 17-1.  Failing to provide adequate third-party information may lead both to the application of adverse inferences drawn from the facts available as well as a high tariff rate.  In 2010, the CIT upheld such determinations in *Max Fortune Industrial Ltd. v. United States.* 853 F. Supp. 2d 1258.  In that case, an informant provided evidence of the petitioner's provision of insufficient information about third parties.  *Id.* at 1262.  This proved central to Commerce's later determination.  *Id.* (noting that "[c]omparing the information from Max Fortune and the Chinese Informant during verification, Commerce decided . . . the Chinese Informant's documents were 'of a higher quality *and* a larger quantity'").  Commerce's consequent decision to apply "total AFA and [assign] a 112.64% duty margin," on the basis of an unforthcoming plaintiff's failure to provide information regarding third parties, was sustained.  *Id.*  This case is instructive because Plaintiffs presume erroneous conduct on Commerce's part when appearances may instead suggest established practices were followed.  The Motion's deficiencies thus render it insufficient to demonstrate a high likelihood of success on the merits.

### c.  Balance of the Equities

Plaintiffs are both mistaken about and manage to misconstrue the balance of equities at this juncture in the case.  The harm movants claim they will suffer remains the payment of cash deposits during the period of judicial review.  Should they succeed in overturning Commerce's determination, Plaintiffs admit they will receive "a refund of the excess duties deposited with interest."  Pls.' Mot. at 10, ECF

No. 17-1.  America's retroactive system, financially inconvenient as it may be, is the course adopted by Congress and committed to Commerce and Customs to enforce. *Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361, 1366 (CIT 2017) ("[P]aying deposits pending court review is an ordinary consequence of the statutory scheme.") (quoting *MacMillan Bloedel Ltd. v. United States*, 16 CIT 331, 333 (1992)).  A typical inconvenience, envisioned by the statutory scheme at hand, does not amount to a cause for equitable relief.  As noted earlier, this harm fails to meet the threshold of "irreparability" in the Court's analysis.

Plaintiffs give short shrift to the harm potentially caused to Defendant.  They fail to consider that their assumption of a minimal impact on the United States contradicts "the determinations at the core of this matter that a tariff increase is necessary to counter-act serious injury or the threat of serious injury."  *Corus Group*, 217 F. Supp. 2d 1347, 1356.  Commerce's prior findings suggest that significant harm would result if the effective suspension of the underlying tariff would allow underpriced goods to "flood the market."  *Id.*  Absent abnormal facts, a court should be reticent to unwind the entire remedy the Government has ordered, especially when it accords with a clear statutory scheme.

Plaintiffs also misapprehend the risk of nonpayment of the instant tariffs.  Their proposed temporary prohibition on paying the required deposits jeopardizes the collection of duties by postponing them.  Prior rulings of this Court establish that "[t]his is a more than theoretical possibility."  *Olympia Indus., Inc. v. United States*, 30 CIT 12, 18–19 (2006).  Yet Plaintiffs contend the Government "will continue to be

protected by the required Continuous Customs Entry Bond at the amount set by established Customs guidelines," adding that "entries will continue to be subject to a suspension of liquidation and at the same cash deposit rate which has previously applied to [Shanghai] Tainai."   Pls.' Mot. at 15, ECF No. 17-1.   However, this argument mischaracterizes Commerce's use of bonds to safeguard its execution of duties.   As Customs explained earlier this year:

> A continuous bond is 10% of duties, taxes and fees paid for the 12 month period. Current bond formulas can be found on www.CBP.gov. A single entry bond is generally in an amount not less than the total entered value, plus any duties, taxes and fees. The amount of any CBP[2] bond must not be less than $100, except when the law or regulation expressly provides that a lesser amount may be taken.

*Bonds – How are Continuous and Single Entry bond amounts determined?*, U.S. Customs and Border Protection (cbp.gov), https://bit.ly/cbpbonds (last accessed: April 27, 2022).   The ten percent of duties held in bond is low relative to the total rate that Commerce has determined is necessary.   Risking ninety percent of duties through postponement of cash deposit collection is an immediate harm that does not compare to the inconvenience inflicted on Plaintiffs.   The balance of equities favors the Government in this instance.

### d.  Serving the Public Interest

A review of the circumstances surrounding Plaintiffs' Motion demonstrates that the public interest would not be served by granting the relief they seek.

---

[2] Throughout this opinion, the Court uses "Customs," instead of CBP, to denote U.S. Customs and Border Protection.

Plaintiffs assert that two outcomes resulting from the collection of cash deposits are adverse to the public interest.  First, they suggest:

> [M]ultiple major U.S. producers of major industrial equipment will lose access to critical components necessary for the production of their major products.  While the components represent a comparatively small percentage of the value of the end products, these TRB's, which are approved by the equipment producer for use in their products, cannot be replaced by any other antifriction bearing until a substitute product is located, and completes a lengthy approval process.

Pls.' Mot. at 11–12, ECF No. 17-1.  These assertions are undermined by Plaintiffs' own affidavit.  Mr. Stoker states that buyers have either agreed or are contemplating agreeing to purchase TRBs with the current duty included.  ECF No. 17-1 at 22. These items constitute a small share of the supplies required for the production of other goods, and Plaintiffs notably do not assert that any of their customers are in immediate danger of ceasing production of any goods.  ECF No. 17-1.  Second, Plaintiffs note that "[i]t is not in the public interest to permanently damage or destroy a business based on a rate which is, on its face, unsupportable."  Pls.' Mot. at 12, ECF No. 17-1.  However, once again, the affidavit undermines Plaintiffs' claims.  Mr. Stocker's affidavit paints a picture of a company negotiating with its customers to find a way to continue business operations.  It nowhere claims plants are on the verge of closure much less that an entire company will be destroyed.  ECF No. 17-1.  Against these speculative and unsupported claims, the public's greater interest lies in following Congress's legislative enactments in the normal course and ensuring that Customs collects cash deposits sufficient to protect the public fisc.  *See* 19 U.S.C. §§ 1673(c)(1)(B)(ii), 1675(a)(2)(C).  The public interest thus favors the Government; and

as Plaintiffs have not clearly prevailed in any of the four required analyses, they are not entitled to the extraordinary remedy of a preliminary injunction.  *Winter*, 555 U.S. at 20.

## II.  Writ of Mandamus

In the alternative, Plaintiffs request a writ of mandamus "directing CBP not to collect cash deposits based on the [F]inal [R]esults."  Pls.' Mot. at 12, ECF No. 17-1.  In submitting this request, Plaintiffs admit awareness that the writ is a "drastic remedy which is invoked only in extraordinary circumstances."  *Id.* (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980)).  Nonetheless, Plaintiffs fail to provide even baseline evidence that the three obligatory criteria for the writ are present.

Mandamus is only appropriate when a three-part test is fully met.  The components are: (1) the party seeking mandamus must have no other adequate means to obtain the relief desired; (2) the right for issuance of the writ is "clear and indisputable," and (3) the issuing court must view the writ as appropriate under the circumstances.  *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380–81 (2004).  Further, mandamus shall issue only when "limited to enforcement of a specific unequivocal command, the ordering of a precise, definite act . . . about which [a specific government official] had no discretion whatever."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (internal citations and quotations omitted).  In response to this precedent, Plaintiffs concede that "[n]ormally, this [right] would be reflected in a 'final' Court decision on specific issues which has not yet been

implemented because of the existence of other issues." Pls.' Mot. at 14, ECF No. 17-1. They assure the Court that:

> In this case, Tainai submits that the right to the writ arises from the fact that, while there is no final Court decision, there is also no question that the Department's underlying determination is inaccurate and cannot be sustained. Tainai has a right to have this inaccurate and incorrect decision corrected, and to have it corrected before Tainai is severely damaged, if not destroyed by the clearly erroneous decision.

*Id.*

Plaintiffs' Motion is insufficient to warrant a writ of mandamus. The three-part test requires that there be "*no* other adequate means to attain the relief desired." *Cheney*, 542 U.S. at 380 (emphasis added). This proviso is designed, the Supreme Court has elaborated, "to ensure that the writ will not be used as a substitute for the regular appeals process[.]" *Id.* at 380–81. Plaintiffs will receive a sufficient remedy if they prevail through the required refund, with interest, of all excessive duties paid. *See* 19 U.S.C. §§ 1671f, 1673f, 1677g; 19 C.F.R. § 351.205(d). Mandamus is not necessary where the normal legal process suffices.

The Court also must reject Plaintiffs' request because it seeks to compel an outcome for which the Court cannot issue a writ of mandamus. "Commerce enjoys broad, although not unlimited, discretion with regard to the propriety of its use of facts available." *Goldlink Indus. Co. v. United States*, 30 C.I.T. 616, 622 (2006). Because Plaintiffs' right to relief rests not on any "specific unequivocal command," *Norton*, 542 U.S. at 63, but rather a judgment about Commerce's exercise of its discretion, mandamus will not lie.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for a preliminary injunction or, in the alternative, a writ of mandamus.  Plaintiffs have not met the criteria necessary for the extraordinary remedy of enjoining the normal operation of the tariff collection system, and a writ of mandamus may not lie where the action challenged is discretionary.  It is hereby:

**ORDERED** that the Motion is **DENIED** and, it is further;

**ORDERED** that subsequent proceedings shall continue in accordance with Rule 56.1 of the Rules of this Court.


**SO ORDERED.**


                                                           /s/        Stephen Alexander Vaden
                                                           Judge Stephen Alexander Vaden

Dated: June 17, 2022
          New York, New York

24